**In re William MARTIN, Sr., Debtor.**

**Bankruptcy No. 89 B 09796.**

United States Bankruptcy Court, N.D. Illinois, E.D.

April 26, 1990.

Bernard M. Kaplan, Ruben, Kaplan & Rosen, Skokie, Ill., for debtor.

Paul M. Bauch, Bell, Boyd & Lloyd, Chicago, Ill., for Bay State Milling Co.

David Neff, Jenner & Block, Chicago, Ill., for official creditors committee.

David A. Kallick, Hurley & Kallick, Ltd., Deerfield, Ill., for LaSalle Bank Northbrook.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK B. SCHMETTERER, Bankruptcy Judge.

This cause is before the Court upon motion of Bay State Milling Company ("Bay State"), a creditor of William Martin, Sr. ("Debtor"), for an order dismissing Debtor's case under Chapter 11 of the Bankruptcy Code, or alternatively converting it to a case under Chapter 7. The Court having considered the motion, and the record of these proceedings, heard the testimony of the witnesses, examined the documents received in evidence and otherwise being fully advised does hereby make and

enter the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. Debtor is an individual. He owns 100% of the outstanding shares of National Flour Company of Illinois ("NF–Illinois"), an Illinois corporation. Until October of 1989, NF–Illinois was engaged in the business of wholesale flour distribution. The NF–Illinois stock held by Debtor has very little, if any, value.

2. Debtor also owns approximately 45% of the outstanding shares of Country Maid Bakery Company ("Country Maid"), an Illinois corporation. The remainder of the Country Maid stock is owned by Debtor's wife, June Martin (40%), and Debtor's three children (5% each). Country Maid is engaged in distribution and sale of wholesale and retail baked goods. Country Maid's principal retail store and bakery is located in Northbrook, Illinois. It also operates retail bakeries and coffee shop outlets in four suburban community areas. Country Maid employs approximately 90 employees.

3. Debtor is President of Country Maid. He attends Country Maid's Northbrook bakery almost every day. However, his participation in day-to-day management of the bakery itself is limited and performed on an *ad hoc* basis. He does perform certain functions traditionally associated with higher level management, including negotiating of leases and union contracts, and arranging financing for Country Maid. He also supervises Country Maid's satellite stores and is actively involved in solving serious personnel problems and any significant difficulties with Country Maid's suppliers.

4. NF–Illinois and Country Maid each maintain separate books and records and file separate income tax returns as corporations.

5. Debtor formerly owned 50% of the outstanding shares of National Flour Company of Wisconsin ("NF–Wisconsin"), a Wisconsin corporation. The remaining 50% of the NF–Wisconsin stock was owned by Phillip Sylvester ("Sylvester"). NF–Wisconsin was engaged in the business of wholesale flour distribution. On February 1, 1985, Debtor sold his 50% interest in NF–Wisconsin to Sylvester.

6. Bay State is a flour miller and a wholesale distributor of flour and milled grain products. On March 14, 1967, Debtor and his wife executed a guarantee of NF–Illinois obligations to Bay State. On August 10, 1983, Debtor and Sylvester executed a guarantee of NF–Wisconsin's obligations to Bay State.

7. After Debtor's execution of the NF–Wisconsin guarantee, Bay State shipped goods to NF–Wisconsin on open account. As of February 1, 1985 and also as of June 1, 1985, NF–Wisconsin owed Bay State approximately $400,000 on account. NF–Wisconsin defaulted on its obligations to Bay State and Bay State made demand upon Debtor for payment of NF–Wisconsin's account under Debtor's August 10, 1983 personal guarantee. Debtor refused this demand. He asserted that on account of the sale of his interest in NF–Wisconsin on February 1, 1985, he was no longer liable on the NF–Wisconsin guarantee.

8. Prior to June 1, 1985 Debtor owned 60% of the outstanding shares of Country Maid. On that day, he transferred, in the aggregate, 15% of the outstanding shares of stock of Country Maid as gifts to his children. The gifts were the result of discussions between Debtor and Lawrence Goldstein, the certified public accountant employed by Country Maid, and were motivated by Debtor's estate planning needs. During the Christmas season in 1984, Debtor told his three children, Betty Lou Doty, William W. Martin, Jr., and Diana June Franchi, that he was giving each of them a gift of 250 shares (5% to each of the total issued stock) of Country Maid stock. However, the instrument of conveyance was not executed until June 1, 1985. Shortly thereafter Debtor met with each of his three children individually and handed each a stock certificate for 250 shares in Country Maid made out in their name. Each child returned the stock certificate to Debtor so that it could be stored for safe keeping with other Country Maid corporate records. However, these stock certificates were not

signed by Debtor or Debtor's wife in their capacity as corporate officers. Although as early as 1984 Debtor was under some pressure from Bay State to reduce outstanding balances, at the time of these gifts Debtor had not yet been sued by Bay State on the guarantee. Further, he believed he had been released from his personal guarantee of the NF–Wisconsin obligations to Bay State by the sale of his stock interest in that corporation.

9. Two months after the stock was conveyed, in August of 1985, Bay State filed a civil action in the United States District Court for the Eastern District of Wisconsin seeking, judgment against Debtor on the NF–Wisconsin guarantee. In this same civil action, Debtor's co-defendants, Sylvester and NF–Wisconsin, filed cross-claims against Debtor for fraud and conversion.

10. The District Court entered partial summary judgment in favor of Bay State with respect to Debtor's liability on the NF–Wisconsin guarantee. The District Court conducted a jury trial to determine the amount of Bay State's damages, and to determine Sylvester and NF–Wisconsin's claims against Debtor. The jury returned a verdict in favor of Bay State liquidating its claims against Debtor and in favor of Sylvester and NF–Wisconsin on their cross-claims against Debtor. On August 17, 1988, the District Court entered judgment pursuant to the jury verdict in favor of Bay State in the amount of $447,528.36. The basis of liability to Bay State was in part Debtor's failure to give written notice to Bay State of his revocation of the NF–Wisconsin guarantee. Accordingly, the guarantee was still enforceable. *Bay State Milling Co. v. National Flour Co. of Wisconsin, Inc., et al.,* No. 85–C–1242 (E.D. Wis. August 17, 1988) (judgment order). The District Court also entered judgment in favor of Sylvester in the amount of $50,000 in compensatory damages and $70,-025.79 in punitive damages, finding that Debtor "made an untrue representation of fact, knowing it was untrue, or recklessly without caring whether it was untrue and with the intent to deceive and induce [Sylvester] to act upon it"; and in favor of NF–Wisconsin in the amount of $25,998.28

for conversion of property owned by NF–Wisconsin. Id. Debtor filed a timely notice of appeal from the judgment, and this appeal is now pending in the United States Court of Appeals for the Seventh Circuit: *Martin v. Bay State Milling Company,* et al., No. 89 1336.

11. On April 25, 1989, Bay State filed a Verified Petition for Registration of Foreign Judgment in the Circuit Court in and for Cook County, Illinois: *Bay State Milling Company v. Martin,* No. 89 L 5461 (Ill.Cir.Ct.). On May 9, 1989, Bay State delivered a certified copy of the judgment to the Sheriff of Cook County, Illinois. On May 11, 1989, Bay State initiated a Citation to Discover Assets proceeding in connection with the registration proceeding. The Petition and Citation were served upon Debtor on May 14, 1989. Bay State recorded the Verified Petition and the Judgment with the recorder of deeds of McHenry County, Illinois on May 25, 1989.

12. Debtor filed his voluntary petition for relief under Chapter 11 of the Code on June 13, 1989.

13. On July 6, 1989 Debtor executed a "Statement of Financial Affairs for Debtor Not Engaged in Business". In this statement, Debtor represented that his occupation is serving as the President of both NF–Illinois and Country Maid, but that he had not received a salary from either corporation during the previous two calendar years. Bay State Ex. # 11. At trial Debtor stated he has never been paid a salary from either Country Maid or NF–Illinois. Debtor has also represented that his current income is from social security ($557/mo.) and approximately $1,000 to $1,200 per month drawn from Country Maid which Debtor characterizes as a "repayment of advances" previously made by him and his wife to the corporation. Debtor's Schedule of Current Income and Current Expenditures, Bay State Ex. # 13.

14. As of August 4, 1989, NF–Illinois owed Bay State in excess of $42,000.00 on account. NF–Illinois defaulted on its obligations to Bay State and Bay State made

demand upon Debtor for payment of NF–Illinois account. Debtor did not pay it.

15. Bay State filed this motion for an order dismissing or converting this Chapter 11 proceeding on September 7, 1989. At a status hearing on October 13, 1989, the Court entered an order requiring Debtor to file a plan and disclosure statement containing certain information set forth in the order. The Court also required Debtor to file debtor-in-possession operating reports for the months of June–September, 1988.

16. Debtor submitted a Plan of Reorganization (the "Plan") and Debtor's Disclosure Statement in Support of Plan Arrangement (the "Disclosure Statement"), both dated November 1, 1989. These documents in general provide that Debtor will pay his unsecured creditors 25% of the allowed amount of their claims over a four-year period (5% upon confirmation and 5% in each of the next four years). The Disclosure Statement does not fully comply with the Court's October 13, 1989 order. Specifically, the Disclosure Statement does not contain a liquidation analysis or a specific dollar projection of future available cash flow necessary to support the Plan.

17. The Disclosure Statement and Plan indicate that the funds to make payments called for under the Plan are to come from distributions which Debtor believes he can persuade the other owners of Country Maid to allow, or alternatively from monies to be obtained by loans from LaSalle Bank of Northbrook ("LaSalle Bank"). "Debtor believes that the monies necessary to effectuate the within Plan can be obtained from either [LaSalle Bank] and/or [Country Maid]." Plan, Art. IV, ¶ 2. Although Debtor has had discussions with representatives of LaSalle Bank, he has not received a loan commitment from the bank. With respect to Country Maid, the Plan states that "Debtor firmly believes that the other shareholders of [Country Maid] would not be adverse to Debtor drawing a salary from that corporation in order to assist him in effectuating this Plan." Id. The testimony at trial corroborated this statement. The family is a close one, and the other stockholders (who are also directors and officers) would likely authorize a salary to Debtor if the business can support it.

18. Lawrence Goldstein, Ltd., a private accounting firm, prepared financial statements for Country Maid for the years 1984–1988. The financial statements were compilations prepared with information provided by management and omit substantially all of the disclosures required by generally accepted accounting principles. No audit was ever conducted.

19. In addition to the fact that no independent audit of Country Maid has ever been conducted, the lack of information makes the financial statements very difficult to understand. A number of categories of assets, liabilities, and equity vary greatly from year-to-year with no explanation. For example, Debtor asserts that the money he and his wife have received and continue to receive from Country Maid is the repayment of advances they had previously made to the corporation. Country Maid records this obligation to Debtor and his wife on its balance sheet as a long-term liability, "Loan Payable–Shareholders." This account has varied as follows:

| Year Ended | Loan Payable–Shareholders |
|---|---|
| 11/30/84 | $ − 83,467 |
| 11/30/85 | 384,623 |
| 11/30/86 | 100,000 |
| 11/30/87 | 99,943 |
| 11/30/88 | − 10,582 |

There was no evidence of loans by Debtor to Country Maid during 1989 or 1990. Thus, Debtor's Plan projection of continued payments of $1,000–$1,200/month from Country Maid as "repayment of advances" is mischaracterized. At present, those payments are either loans or salaries. In the fiscal years ending in 1985 and 1986, Country Maid's balance sheet shows as an asset a loan receivable from NF–Illinois in amounts of $242,832 and $249,632 respectively. In 1987 and 1988, however, Country Maid shows as a liability, not an asset, loans payable to NF–Illinois of $47,582 and $253,104 respectively. There are also wide fluctuations in the cash-on-hand, paid-in capital and retained earnings accounts throughout these years.

20. The net pre-tax earnings reported by Country Maid on its federal corporate

income tax returns for the tax years 1984–1987 was:

| | |
|---|---|
| 1984: | ($192,684.00) |
| 1985: | ($184,851.00) |
| 1986: | ($141,452.00) |
| 1987: | ($103,125.00) |

Mr. Goldstein testified that over these same years Country Maid had a seasonal but positive cash flow, and that the income tax losses were due to noncash charges such as depreciation. However, from the returns themselves it appears that reported losses exceeded depreciation.

21. Lawrence Goldstein, Ltd. was not at the time of trial yet retained to provide accounting services for NF–Illinois or Country Maid during 1989. There have been no financial statements, balance sheets, or income statements prepared on either a monthly, quarterly, or annual basis for either NF–Illinois or Country Maid during 1989. Accordingly, there are no financial records of NF–Illinois or Country Maid from which to judge their present financial condition, or their future earning capability. Hence, the Debtor's ability to make payments under the Plan, which rests on his income projected from those companies, is not yet proved.

22. The Debtor's son, William Martin, Jr., formerly served as the chief operating officer of NF–Illinois. Subsequent to commencement of this case, he organized Central Baking Supply Company, Inc. ("Central"), an Illinois corporation. Central used NF–Illinois' telephone number for a short time. Central also utilizes the same accounts receivable factor and warehouse facility. Finally, Central sells to some of NF–Illinois's former customers, and buys from some of the same suppliers NF–Illinois had used.

23. Further Facts stated in the Conclusions of Law will stand as additional Findings of Fact.

## CONCLUSIONS OF LAW

1. The dismissal of a case under Chapter 11 of the Bankruptcy Code or the conversion of such a case to a case under Chapter 7 is addressed in 11 U.S.C. § 1112(b). This subsection provides in part:

> On a request of a party-in-interest or the United States Trustee, and after notice and hearing, the court may convert a case under this Chapter to a case under Chapter 7 of this Title or may dismiss a case under this Chapter, whichever is in the best interest of creditors and the estate, *for cause, including* —
>
> (1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation;
>
> (2) inability to effectuate a plan;
>
> . . . .
>
> (4) failure to propose a plan under section 1121 of this title within any time fixed by the court.

11 U.S.C. § 1112(b)(1), (2), (4) (emphasis added).

2. Bay State argues that each of the three above enumerated grounds have been satisfied. In addition, Bay State asserts that Debtor did not file its Chapter 11 petition in good faith. Although 11 U.S.C. § 1112(b) does not specifically include a debtor's lack of good faith in filing a voluntary petition among enumerated grounds warranting dismissal or conversion, courts in this Circuit have construed this section as including such a requirement. *In re Madison Hotels Associates*, 749 F.2d 410, 426 (7th Cir.1984); *In re Mandalay Shores Cooperative Housing Ass'n, Inc.*, 63 B.R. 842, 847–48 (N.D.Ill.1986); *In re Schlangen*, 91 B.R. 834, 837 (Bankr.N.D.Ill.1988). Pursuant to its efforts to show Debtor's lack of good faith in this case, Bay State has asserted and argued that Debtor's June 1985 gifts of 5% of the Country Maid stock to each of his three children were fraudulent conveyances under Illinois law. Bay State asserted the same issue in a motion to have itself appointed to recover the alleged fraudulent conveyances.[1]

---

1. Specifically, Bay State pleaded the asserted bad faith, proposed before trial in conclusions of law relating to its contentions and called Betty Lou Doty and Diane Franchi, Debtor's two daughters, as witnesses. The scope of the direct examination focused almost exclusively on the circumstances surrounding the gift of the Country Maid stock they received from their father.

## A. Fraudulent Conveyances

3. Illinois law applicable to this case is codified in § 4 of chapter 59 of the Illinois Revised Statutes.[2] In pertinent part, this section provides:

> Every gift, grant, conveyance, assignment, or transfer of ... any estate, real or personal, ... made with the intent to disturb, delay, hinder or defraud creditors or other persons ... shall be void as against such creditors, purchasers and other persons.

Ill.Rev.Stat. ch. 59, § 4. Illinois courts have construed section 4 as prohibiting both "fraud in fact" and "fraud in law." *Wilkey v. Wax,* 82 Ill.App.2d 67, 225 N.E.2d 813 (1st Dist.1967). Fraud in law requires that the court find that the debtor "had a specific intent to defraud creditors, while in fraud in law cases, fraud is presumed from the circumstances." *Tcherep-*

11 U.S.C. § 544(b) empowers a trustee (or debtor-in-possession) to pursue a fraudulent conveyance action based on state law only if an unsecured creditor who could pursue such a claim actually exists. If the trustee or the debtor-in-possession refuse to bring a fraudulent conveyance action, courts have authorized other parties to do so. *See, e.g., In re Ohio Corrugating Co.,* 91 B.R. 430 (Bankr.N.D.Ohio 1988).

2. The Illinois legislature has recently adopted the Uniform Fraudulent Transfer Act (the "UFTA") which supersedes Ill.Rev.Stat., ch. 59, § 4. *See* Public Act 86–814 (codified in Smith-Hurd Illinois Annotated Statutes ch. 59, ¶¶ 101–112). The UFTA provides that it is "effective" as of January 1, 1990. The UFTA does not specifically address whether it is to be applied to cases which were pending as of its effective date, but that involve allegations that earlier transfers were fraudulent conveyances. In general, there is a presumption that statutory provisions apply only prospectively *to conduct* that occurs on or after the statute's effective date. As Judge Roszkowski recently explained:

> The effective date of a statute implicates conduct taken on or after that date. Application of the statute to such conduct is deemed prospective. The effective date may also serve to impose the dictates of the new statute upon cases pending on or after the date, regardless of when the conduct which is the subject of the cases occurred. Application of a new statute to conduct occurring before the effective date constitutes retroactive application of the statute.
>
> Absent clear and unequivocal statements by Congress to the contrary, legislative enactments are presumed to operate prospectively

*nin v. Franz,* 475 F.Supp. 92, 96 (N.D.Ill. 1979) (citations omitted).

### 1. Fraud in Fact

4. Bay State first argues that the June 1985 stock gifts were made by Debtor with actual intent to defraud his creditors. Bay State relies on the asserted existence of certain of the "badges of fraud"—circumstances commonly associated with fraudulent transfers. *Kaibab Industries, Inc. v. Family Ready Homes, Inc.,* 80 Ill.App.3d 782, 14 Ill.Dec. 334, 337, 372 N.E.2d 139, 142 (3rd Dist.1978). The Illinois Supreme Court addressed this point in *Zwick v. Catavenis,* 331 Ill. 240, 162 N.E. 869, 872 (1928), stating:

> There may be circumstances attending conveyances and transfers to hinder, delay, and defraud creditors, which are in law denominated "badges of fraud." *They do not in themselves constitute fraud, but are rather signs or indicia*

and not retrospectively. *United States v. Security Indus. Bank,* 459 U.S. 70, 79, 103 S.Ct. 407, 412–13, 74 L.Ed.2d 235 (1982). As our Court of Appeals has implicitly recognized, this proposition is not at odds with the Supreme Court's 1974 rejection in *Bradley v. School Board of City of Richmond,* 416 U.S. 696, 715, 94 S.Ct. 2006, 2018, 40 L.Ed.2d 476 (1974) of the presumption against retroactivity. *United States v. Kairys,* 782 F.2d 1374, 1381 (7th Cir.1986). In *Bradley,* the Supreme Court used a vested rights or manifest injustice standard in determining whether it should apply retroactively the statutory provision before it. The Seventh Circuit in *Kairys* combined the *Security Indus. Bank* and *Bradley* approaches by applying the presumption against retroactivity while recognizing that the presumption "is even more appropriate when the statute affects vested rights." *Kairys,* 782 F.2d at 1381, citing *Bradley,* 416 U.S. at 720–21, 94 S.Ct. at 2020–21.

*Allied Corporation v. Acme Solvents Reclaiming, Inc.,* 691 F.Supp. 1100, 1110 (N.D.Ill.1988). Of course, where legislative intent is clearly to make a new law retroactive to pending cases on prior conduct, that intent will be applied. *Matter of Busick,* 831 F.2d 745, 748 (7th Cir.1987). In the case of the UFTA there is no indication from the Illinois legislature that the new provisions should apply to transfers that occurred before its effective date of January 1, 1990. Accordingly, this court applies chapter 59, § 4, the statutory provision in effect in June of 1985, the date of Debtor's stock gift to his children.

*from which the existence of fraud may be properly inferred as a matter of evidence. Badges of fraud are not conclusive but are strong or weak, according to their number and concurrence in the same case. They may be overcome by evidence establishing the bona fides of the transaction.* Whether badges of fraud shown in the evidence are sufficient to establish the fact that the conveyance in question was fraudulent is a matter for the jury to decide.

(emphasis added).

■ 5. Bay State argues that Debtor transferred the stock to his family members for no consideration at a time when Bay State was "pressing" him for payment on the NF–Wisconsin guaranty. A gift by a financially distressed person to a family member is indeed one of the classic badges of fraud scenarios. The degree to which this Debtor was actually financially distressed at the time of the gifts is not clear from the evidence. Moreover, after hearing the evidence at trial, particularly the testimony of Debtor and his daughters, this court finds that Debtor's actual intent in conveying to his three children a minor part of his stock was not to defraud his creditors. As the quotation from *Zwick* illustrates, the badges of fraud are only indicia of fraudulent intent and such indicia can be rebutted. Here it was rebutted. Debtor was motivated by a desire to give each of his children a small share of the family business in which they work, and by his estate planning purposes. He did not transfer the small number of shares to his children with intent to defraud his creditors.

### 2. *Fraud in Law*

■ 6. Illinois and other jurisdictions also recognize a constructive fraud theory called "fraud in law," under which there is no requirement of actual intent to defraud. *See, e.g.,* Eugene R. Wedoff & John E. Barnes, *Fraudulent Conveyances and Leveraged Buyouts,* Chicago Bar Ass'n Outline 8 (January 24, 1990). Under this doctrine, Debtor's actual intent is irrelevant. If the transfer works fraud on creditors, it can be set aside. In order to prove fraud in law, three elements must be established: (1) a voluntary gift, (2) an existing or contemplated indebtedness against the debtor, and (3) failure of the debtor to retain sufficient property to pay the indebtedness. *State Bank of Clinton v. Barnett,* 250 Ill. 312, 95 N.E. 178, 181 (1911); *Tcherepnin,* 475 F.Supp. at 96–97 (citations omitted).

7. In this proceeding only the third element is in issue. Debtor concedes that he received no consideration for the transfer of 15% of the Country Maid stock to his children (5% each), and there is little question that Debtor was indebted to certain creditors at this time. The evidence presented at trial on the third element, whether Debtor retained sufficient assets to pay his indebtedness at the time he made the stock gift, was inconclusive. Insufficient information about Debtor's financial condition in June 1985 was introduced. Accordingly, resolution of the fraud in fact issue turns on whether Bay State or Debtor bore the burden of proof on this element. The party who did loses.

8. Bay State concedes that it bears the burden of showing that Debtor's gifts to his children constituted a fraud in law. However, it asserts that upon showing the stock transfers were made for inadequate consideration while its claim against Debtor was pending, the burden of proving that Debtor retained sufficient assets shifted to Debtor. Specifically, Bay State argues:

> Bay State's showing that the stock transfers were without consideration at the time its claim was pending against the debtor created a presumption of fraud and shifted the burden of proof on the issue of retained assets to the debtor and the transferees. "The presumption of fraud in such cases can be rebutted *only if the debtor shows that he retained sufficient property to pay his or her obligations* or that adequate consideration was given for the transfer." *Indiana National Bank v. Gamble,* 612 F.Supp. 1272, 1276 (N.D.Ill.1984).

Bay State Supplemental Trial Memorandum at 3. (emphasis in the original).

9. Before turning to the specifics of Bay State's argument under Illinois law, it is helpful to recall the context in which the fraud in fact theory arose. Originally a creditor asserting that a fraudulent conveyance had occurred was required to show that the debtor had an actual intent to defraud his or her creditors. *See, e.g.,* Wedoff & Barnes, *Fraudulent Conveyances,* Chicago Bar Ass'n Outline 1–10 (January 24, 1990); Peter A. Alces & Luther M. Dorr, Jr., *A Critical Analysis of the New Uniform Fraudulent Transfer Act,* 1985 U.Ill.L.Rev. 527, 529–37; Douglas G. Baird & Thomas H. Jackson, *Fraudulent Conveyance Law and Its Proper Domain,* 38 Vand.L.Rev. 829, 830–34 (1985). It was and is very difficult for a creditor to meet this burden. In response to this problem, courts initially resorted to an analysis of the badges of fraud. Alces & Dorr, *Critical Analysis,* at 530.

> Although a strict construction of the [Statute of 13 Elizabeth] required proof of fraudulent intent, many courts permitted creditors to avoid a transfer on the basis of objective factors alone. The resulting decisions became increasingly difficult to rationalize. Ultimately, some of the objective indicia of fraud rose to the status of conclusive presumptions and once the courts found these objective criteria, evidence of the parties' intent was neither *required nor relevant.*

Id. As the quoted language indicates, the focus of the test began to shift from one of the debtor's intent to whether there had been an "unjust diminution of the estate of the debtor that otherwise would be available to the creditor." Id. at 532 quoting in part 1 G. Glenn, *Fraudulent Conveyances and Preferences,* § 195 at 348 (rev. ed. 1940).[3]

10. There is no conceptual reason for this shift in emphasis to alter the creditor's burden of establishing the elements of constructive fraud. A creditor's burden of proof under the fraud in law doctrine must logically include both a transfer without consideration and insufficient assets at the time of transfer to satisfy existing debt. The creditor is attempting to show that the debtor has committed fraud. Under the fraud in law doctrine, if certain circumstances exist, fraud will be presumed as a matter of law. However, a gift by itself is not per se bad even when claims against the donor exist. It is only wrong under the law when the debtor doesn't retain enough property to pay his or her existing indebtedness at the time of the transfer. The combination of these components is what establishes that a creditor has been hindered or defrauded. Accordingly, the creditor should logically bear the burden of establishing each of these elements.

11. This reasoning was specifically recognized by the Illinois Supreme Court long ago:

> No one will dispute the principle appellant seeks to establish that a voluntary conveyance, when the grantor is indebted at the time of its execution, is presumptive evidence of fraud; and a fraudulent intent will be presumed from the fact that the party conveying was indebted at the time the conveyance was executed, and that as to pre-existing creditors every conveyance not made on a consideration valuable in law is void. The principle is thus broadly stated, but is subject to some qualification—to this extent, at least that the debtor retains in his possession property sufficient to discharge all debts existing at the time of making the conveyance alleged to be fraudulent. If this was not permitted, trade of every description would be very much crippled, and, instead of there being an active interchange of property, the whole busi-

---

**3.** In many states, but not Illinois, this process culminated in the enactment of the Uniform Fraudulent Conveyances Act (the "UFCA"). Under the UFCA certain categories of transfers were deemed fraudulent as a matter of law, regardless of the debtor's intent. Specifically, a fraudulent transfer occurred as a matter of law under the UFCA when a debtor transfers property for less than "fair consideration" and: (1) the debtor was insolvent or is rendered insolvent by the transfer; (2) the debtor is left with "unreasonably small capital" after the transfer; or (3) the debtor intended or believed that it would incur debt beyond its ability to pay. UFCA § 4; Wedoff & Barnes, *Fraudulent Conveyances* at 2–4. In these situations, the creditor bears the burden of showing that the requisite elements of constructive fraud are met.

ness of the country would stagnate. No creditor without a lien has any right to complain that his debtor is giving away property to his wife or children, *unless such creditor can establish the fact that he has not retained enough to satisfy existing debts.*

*Moritz v. Hoffman,* 35 Ill. 553, 556–57 (1864) (emphasis added). Later in that same case the court stated:

> To impeach such a conveyance successfully *it lies upon the complainant to aver and prove* that he was a creditor at the time and that the grantor was then insolvent, or such facts and circumstances as would authorize a court or jury to presume insolvency, none of which have been established in this case.

*Id.* at 558 (emphasis added). This reasoning has been followed in subsequent cases. *See Bittinger v. Kasten,* 111 Ill. 260 (1884) (fraudulent conveyance cannot be set aside if creditors fails to allege and prove insolvency); *State Bank of Clinton v. Barnett,* 95 N.E. at 181 (quoting extensively from *Moritz* and holding that creditor failed to aver and prove debtor's insolvency at the time the gift was made); *Mills v. Susanka,* 394 Ill. 439, 68 N.E.2d 904, 908–09 (1946) (quoting the above language with favor). *Cf. Kardynalski v. Fisher,* 135 Ill.App.3d 643, 90 Ill.Dec. 410, 482 N.E.2d 117 (2nd Dist.1985) (not addressing who bore burden on third element but holding that element satisfied where although amount of property debtor retained was not part of record, debtor had divested most property in earlier settlement agreement and filed for bankruptcy shortly thereafter).

12. The Illinois Supreme Court later clarified that proof of actual insolvency was not required, but rather that the focus was on whether the transfer "directly tended to or did impair the rights of creditors." *Birney v. Solomon,* 348 Ill. 410, 181 N.E.

318, 320 (1932). *See also Cairo Lumber Co. v. Ladenberger,* 313 Ill.App. 1, 39 N.E.2d 596 (4th Dist.1941) (noting the contrast between the earlier cases and *Birney* but following *Birney* as the most recent statement). A creditor's rights were "impaired" when the debtor retained insufficient assets to cover his or her existing indebtedness. *Birney,* 181 N.E. at 320.[4]

■ 13. In the above cited cases, the Illinois Supreme Court spoke (as Bay State does) of a presumption of fraud arising from a gift when indebtedness is outstanding. However, the Illinois Supreme Court also unequivocally recognized that such a gift is fraudulent only if insufficient property is retained to cover existing indebtedness, and that the creditor must allege and prove the inadequacy of Debtor's remaining assets to cover that debt. It must be concluded under Illinois law that a creditor such as Bay State, who is attempting to establish fraud in law, bears the burden of showing all three of the elements of that cause of action, including the element that debtor retained insufficient property to meet his outstanding indebtedness.

14. As previously noted, Bay State quotes a sentence from *Indiana National Bank* in support of its position (Conclusion No. 8). That sentence was less than crystal clear, and it is more easily understood if read in context with that court's prior discussion of the subject. In full, the court stated:

> However, a voluntary transfer which is made without consideration or which directly impairs the rights of creditors will be regarded as fraudulent in law, irrespective of the honesty of the grantor's motives.
>
> To sustain a claim of fraud in law, a creditor must prove three elements: (1) a voluntary gift; (2) an existing or contem-

**4.** The court also observed that "[i]t is of no moment that the property remaining in the grantor's hands after the conveyance was in nominal value more than equal to the amount of his indebtedness if subsequent events show *that the property retained was not sufficient to discharge all his liabilities.*" 181 N.E. 320. On the other hand, see *Moritz,* 35 Ill. at 559 ("While his ledger told him a tale so pleasing, while he

was buoyant on the wave of prosperity, he secures a home for his wife or for his child, by conveying to a trustee for their use a portion of his estate, voluntarily, and with no consideration except love and affection. No case can be found on the books where such a settlement, under such circumstances, though the grantor afterwards became indebted, has been impeached and set aside.").

plated indebtedness; and (3) failure of the debtor to retain sufficient assets to pay the indebtedness. Because actual intent to impair creditors is irrelevant, the presumption of fraud in such cases can be rebutted only if the debtor shows that he retained sufficient property to pay his or her obligations or that adequate consideration was given for the transfer. If the presumption of fraud is successfully rebutted, then the creditor must prove actual intent to defraud.

*Indiana National Bank,* 612 F.Supp. at 1276 (citations omitted).

■ 15. Thus, the court in *Indiana National Bank* held that the creditor "must prove" all three elements. It went on to say that the "presumption of fraud" can be "rebutted" only if the debtor "shows" either adequate retained assets or adequate consideration. The question, of course, is what gives rise to the "presumption" of fraud. Bay State argues that the presumption arises when there is a voluntary gift at a time when the debtor is under "pressure" from creditors. The difficulty with Bay State's construction is that it gives no meaning to the *Indiana National Bank* statement as to how a debtor can rebut the presumption, namely by showing either that he did retain sufficient property to pay his debts, or "that adequate consideration was given for the transfer." If the court through this sentence contemplated that debtor bore the burden of proof as to the sufficiency of retained assets, then it also would have intended that debtor bears the burden of showing that the transfer was for no consideration. Yet, Bay State concedes that it bears the burden of showing a voluntary gift. The alternative and more plausible construction of the opinion is that the "presumption of fraud" arises only when the creditor has established all three elements, including the failure of the debtor to retain sufficient assets. Indeed, the only plausible reading of *Indiana National Bank* is that the creditor makes a *prima*

*facie* case only by establishing all three elements, and that the debtor can then defend and rebut by evidence negating one or more of the elements. *See Kardynalski,* 90 Ill.Dec. at 413, 482 N.E.2d at 120–21. However, the creditor's initial burden of proof remains clear as to all three elements.

■ 16. There is one Illinois Appellate court case that contains different language. In *Cairo Lumber Co. v. Ladenberger,* 313 Ill.App. 1, 39 N.E.2d 596 (4th Dist. 1942), a creditor alleged that certain transfers of property from debtor to her son were fraudulent under the fraud in law doctrine. The court first determined that the transfers were not made to satisfy valid debts that the son asserted were owing to him. The court then observed that "[s]ince the conveyances were voluntary, it was incumbent on defendants to show that [debtor] retained ample property after the conveyances to pay the plaintiff's claim." Id. at 600. The court then reviewed the evidence presented at trial and concluded that it was "manifest ... that the property claimed to have been retained was wholly insufficient and unavailable for the payment of the plaintiff's claims, and that the conveyances in question tended to and did impair the rights of the plaintiff as a creditor of [debtor]." Id. The *Cairo Lumber* court, however, did not cite *Moritz* or refer to the line of cases following it on this issue. Rather, it cited a different Illinois Appellate Court decision. Moreover, the *Mills* opinion, an Illinois Supreme Court case decided after *Cairo,* also quoted the language used in *Moritz* with favor. *See Mills,* 68 N.E.2d at 909. Finally, the issue of who bore the burden of proof on the retention of adequate property question was not crucial to the decision in *Cairo Lumber.* It must be concluded that the quoted portion of *Moritz* (Conclusion No. 11) continues to state Illinois law accurately.[5] Accordingly, Bay State has not met its

---

5. Bay State also quotes a statement in *Harris v. Aimco, Inc.,* 66 Ill.App.3d 60, 22 Ill.Dec. 823, 825, 383 N.E.2d 631, 633 (5th Dist.1978) that "[w]hen the circumstances show fraud, the burden of dispelling the presumption of fraud and

the showing that actual consideration was given for the transaction is upon the debtor or the person to whom the property was conveyed." This statement does not address the issue of

burden and its effort to show that the stock was fraudulently conveyed to the children (and could be recovered by a Chapter 7 Trustee) fails.

## B. Grounds for Conversion—Inability to Effectuate a Plan

■ 17. Bay State argues that Debtor's case should be converted to a case under Chapter 7 on the ground that Debtor will be unable to effectuate a plan of reorganization. As previously discussed, Debtor submitted his Plan and Disclosure Statement on November 1, 1989. The typical method of testing whether a plan is confirmable is to allow the reorganization process to proceed and eventually hold a confirmation hearing. At such a hearing, a debtor proposing a plan bears the burden of showing that the plan of reorganization complies with the requirements for confirmation enumerated in 11 U.S.C. § 1129(a) and (b). *In re Rusty Jones, Inc.*, 110 B.R. 362, 373 (Bankr.N.D.Ill.1990).

■ 18. Section 1112(b)(2) contemplates that a creditor can halt this process early on by demonstrating that debtor will be unable "to effectuate a plan." [6] This phrase has been construed to mean that "the debtor lacks the ability to formulate a plan or to carry one out." *Hall v. Vance*, 887 F.2d 1041, 1044 (10th Cir.1989); *In re Economy Cab & Tool Co.*, 44 B.R. 721, 725 (Bankr.D.Minn.1984). Although § 1112(b)(2) is typically invoked in cases where debtor is a corporate shell or where creditors are injured by the debtor's delay, courts have found that the failure to file an acceptable plan within a reasonable time can warrant dismissal or conversion where it is indicative of an inability to effectuate a plan. *Hall*, 887 F.2d at 1044 (case dismissed where an acceptable plan not filed within eight months); *In re Koerner*, 800 F.2d 1358, 1368 (5th Cir.1986) (conversion

appropriate where individual debtor had submitted only a "nebulous plan" after sixteen months); *In re Cassavaugh*, 44 B.R. 726 (Bankr.W.D.Mo.1984) (case dismissed where no acceptable plan filed within eight months and debtor conceded that no such plan could be filed). As the Tenth Circuit stated:

> Dismissal under § 1112(b)(2) is appropriate where the debtor's failure to file an acceptable plan after a reasonable time indicates its inability to do so whether the reason for the debtor's inability to file is its poor financial condition, the structure of the claims against it, or some other reason.

*Hall*, 887 F.2d at 1044.

■ 19. At this stage of proceedings on Bay State's motion to convert or dismiss, it, not Debtor, bears the burden of proof. *In re Harvey D. Sheehan* 58 B.R. 296, 300 (Bankr.D.S.D.1986); 5 *Collier* ¶ 1112.03[a] at 1112–15. Such burden on the moving creditor is both fitting and significant. Bay State seeks to cut off Debtor's normal right to have a full confirmation hearing to decide whether his Plan should be confirmed or not, and the instant motion seeks to interdict that right. At this stage, Debtor has not been shown to be dissipating assets or otherwise jeopardizing the position of creditors through delay. Moreover, in this individual Chapter 11 case the creditors had until 60 days after the first meeting of creditors to file adversary cases objecting to discharge or dischargeability of debts. *See* Bankruptcy Rule 4004(a) (setting 60 day time period for objecting to debtor's discharge) and Rule 4007(c) (setting 60 day time period in which to object to the dischargeability of debts described in 11 U.S.C. § 523(c)). No such cases have been filed to our knowledge, and so such actions are now time barred. However,

---

debtor's retention of sufficient property to cover existing debts.

**6.** The word "effectuate" is broad enough that it could conceivably encompass formulating, confirming, implementing and eventually fulfilling a plan or reorganization. Reading the subsection in context, however, indicates that the focus of the provision must be on the ability to

put together and confirm a plan because the failure to carry out a confirmed plan is specifically addressed in other parts of § 1112(b). Specifically, § 1112(b)(7) and (8) state, respectively, that cause includes "inability to effectuate substantial consummation of a confirmed plan," and a "material default by the debtor with respect to a confirmed plan."

should the case be converted to Chapter 7, the 60 day period runs anew. Id.; *In re Goralnick*, 81 B.R. 570 (9th Cir.BAP 1987) (collecting cases). Therefore, in an individual Chapter 11 case where the discharge of debtor is an important objective, an order of conversion revives a threat to debtor that was time-barred. Conversion should not be ordered unless the creditor's burden of proof has clearly been met.

■ 20. Two of the requirements for confirmation, each implicated by Bay State's motion, are the "feasibility" test and the "best interests of creditors" test found in 11 U.S.C. § 1129(a)(11) and (7) respectively. One way to establish that Debtor is unable to effectuate a plan is to show that he will be unable to satisfy either of these two tests. *See, e.g.,* 5 *Collier* ¶ 1112.03[d][ii] at 1112–19 ("One set of circumstances which would dictate conversion or dismissal ... is the inability of the proponent of a plan to satisfy the confirmation standard set forth in section 1129(a)(7).").

21. The "feasibility" test requires that the court find that "[c]onfirmation of the plan is not likely to be followed by the liquidation or the need for further financial reorganization ..." The "best interests" test essentially requires that each holder of a claim in an impaired class that has voted against the plan receive property under the plan on account of such claim that as of the effective date of the plan has a value "that is not less than the amount that such holder would so receive ... if the debtor were liquidated under chapter 7 of this title on such date." 11 U.S.C. § 1129(a)(7)(A)(ii).

■ 22. The Debtor has not in his Plan, in his Disclosure Statement, or at the hearing, given the court any hard numbers, either in the form of pro forma financial statements or a liquidation analysis. Although the case was 6–½ months old at the time of the hearing on Bay State's motion, Debtor was quickly put on notice (first by this Court's general order covering disclo-

sure statements and then by Bay State's objection and motions) that concrete numbers, pro forma financial statements and a liquidation analysis were essential. Courts have emphasized that the disclosure statement must meet the disclosure standards set forth in 11 U.S.C. § 1125(a)(1). *Hall*, 887 F.2d at 1043; *Cassavaugh*, 44 B.R. at 727. More particularly, enough information must be provided as "would enable a hypothetical reasonable investor typical of holders of claims ... of the relevant class to make an informed judgment about the plan...." 11 U.S.C. § 1125(a)(1). Debtor has not yet supplied all such information, apparently due to inadequate books and records of Country Maid.

23. The following unsecured creditors have filed proofs of claim: Bay State ($447,528), NF–Wisconsin ($47,000), NF–Illinois ($42,000), North Dakota Mill & Elevator ($25,000), Phil Sylvester ($146,024) Van Briesen & Purtell, a Milwaukee law firm ($34,588).[7] These claims total approximately $742,140. The Plan provides for 25% payment of the unsecured claims or $185,535 to be paid in 5% annual payments ($37,107 each) beginning upon confirmation and continuing for the next four years.

24. It is clear from the hearing that Debtor's ability to make the payments required under the Plan hinges on Debtor's stock in Country Maid, either through use of such stock as collateral for a loan, or more likely as a source of salary. It is also apparent from the hearing that the remainder of Country Maid's shareholders and officers, Debtor's family, would approve a salary if Country Maid actually generates an adequate positive cash flow. The failure of Country Maid to maintain meaningful financial records, however, makes it utterly impossible for the court to determine as yet whether it is possible for Country Maid to generate approximately $62,000 of disposable annual income ($25,000 of living expenses currently being drawn each year as a "repayment" of the "advances"

---

7. Horizon Federal Savings Bank and LaSalle Bank of Northbrook have also filed proofs of claim for $90,000 and $224,988, respectively. At the hearing Debtor explained that these were secured claims and that the amount of indebted- ness to LaSalle Bank of Northbrook had been substantially reduced. Should these creditors be undersecured the amount of unsecured claims could potentially be larger.

plus $37,000 needed to make the required Plan payments) that Debtor would need to comply with the Plan and avoid a subsequent liquidation or reorganization.

25. The lack of financial records also hampers any efforts to evaluate the possibility that the best interests test can be met. Debtor's Country Maid stock is a nonexempt asset. *See* 11 U.S.C. § 522; Ill. Rev.Stat. ch. 110, ¶ 12–1201. If Debtor's case is converted to a case under Chapter 7 in all likelihood the stock would be sold and the proceeds distributed pro rata to the unsecured creditors. The obvious goal of Debtor's Plan is to preserve Debtor's ownership of his 45% stock interest in Country Maid. Debtor basically contemplates selling the remainder of his assets under the Plan in order to fund the payments called for in it, much the same as would occur in a Chapter 7 liquidation. Accordingly, in the broadest terms, the issue under the "best interests" test is whether the unsecured creditors would receive more from the sale of the stock than they would get pursuant to the proposed payments under the Plan.

26. Assuming Debtor's Plan is feasible, then the "best interests" test requires that the present value of the five $31,000 payments be at least equal to the value of Debtor's 45% interest in the Country Maid stock. Bay State has essentially made no effort to value Debtor's stock. Debtor's own value of the stock has varied widely in the financial records he has prepared.

27. One of the accepted methods of valuation of stock in a closely held business, the discounted cash flow method, requires that the projected cash flow and/or income stream from the underlying business be evaluated. Again, the absence of reliable financial records prevents such analysis. If the Plan is feasible, it seems possible that the best interests test could be satisfied here. A minority interest in a family controlled business often involves a substantial discount off the price normally commanded by stock representing majority control. As Bay State itself recognizes, the majority interest in a closely held business is often able to dissipate the profits of the business in the form of salary to the

family members who work for the corporation and/or simply retain the profits in the corporation. Therefore a minority interest in even a profitable closely held corporation is no assurance of a dependable cash flow to the holder of such an interest. Now that this court has rejected the Bay State effort to set aside the transfers of stock to children, it is possible that Debtor's remaining minority stock interest has a value not greater than the payment proposed under the Plan. At any event, Bay State has not proved the contrary as is its burden on the instant motion.

28. While the lack of reliable financial records means that the court cannot analyze feasibility and best interests adequately, it also means that Bay State has not yet met its burden. Of course that was due in part to Debtor's omissions in the Disclosure Statement and failure of Debtor to supply adequate reliable data pertaining to Country Maid. The remedy of creditors in this situation is to move for appointment of an Examiner or Chapter 11 Trustee. The latter motion has now been made by Bay State and the Creditor's Committee and is set for hearing on March 12, 1990.

29. At trial both Bay State and the Unsecured Creditors Committee stated that Bay State, by virtue of the size of its unsecured claim, would control the unsecured creditors class and vote against the Plan. Therefore a possible obstacle to Debtor's confirmation effort is the requirement that at least one noninsider impaired class must approve a plan of reorganization. 11 U.S.C. § 1129(a)(10). Section 1129(a)(10) requires that "[i]f a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan [must] accept the plan, determined without including any acceptance of the plan by any insider." Accordingly, if the unsecured creditors are all combined in one class and that class is the only impaired class and is controlled by the large claim of Bay State, then Debtor's Plan would not be confirmable.

30. The limitations of this argument, at this juncture of the proceedings, are twofold. First, it is not certain that Bay State

would vote against the Plan. At the hearing Bay State indicated that from its own analysis it would receive more from a conversion and liquidation than under the proposed plan. However, as the earlier discussion indicated, the lack of financial information about Country Maid makes a "best interests" analysis virtually impossible at this stage. Further, it is unclear whether Bay State made its analysis on the assumption that Debtor's estate would include a 60% controlling interest in Country Maid rather than a 45% minority interest. Accordingly, although § 1129(a)(10) may eventually be a problem, at this point in time that concern is premature.

31. Second, there has been no inquiry into whether Debtor can create separate classes of claims, thereby creating the possibility of achieving a consenting impaired class. As Judge Ginsberg explains in his treatise:

> [T]he Bankruptcy Code does not require that all claims or interests that are substantially similar be placed in the same class. This gives the plan proponent flexibility in drafting the plan and creating classes of creditors and equity security holders in terms of deciding how certain identifiable groups of claims or interests are to be treated, as well as a chance to legally manipulate the plan approval process by careful classification.

2 Robert E. Ginsberg § 13.09[d] at 1205 (2nd ed. 1988).

32. Even if Debtor can create separate classes of unsecured creditors such that it could obtain a consenting class of impaired creditors, the ability to confirm a plan is not assured. Section 1129(a)(8) provides that each class of claims must either accept the plan of reorganization or be unimpaired under the plan. Debtor's current plan provides that unsecured creditors will receive only 25% of their claim amounts. If the judgment on the NF–Wisconsin guarantee is not reversed, Debtor has not yet demonstrated that he could pay the unsecured creditors in full under any plan. Bay State's class will therefore likely be impaired and it might still oppose the Plan.

If so, this would implicate the so called "cram down" provisions.

33. An exception to 11 U.S.C. § 1129(a)(8) is provided for in 11 U.S.C. § 1129(b) which allows a plan to be confirmed over the objection of an impaired class as long as the plan "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." A plan is "fair and equitable" with respect to a class of unsecured creditors as long as "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property." 11 U.S.C. § 1129(b)(2)(B)(ii).

34. Section 1129(b)(2)(B)(ii) codifies the so-called "absolute priority rule." Under this rule, an individual debtor cannot retain *any property of the estate* pursuant to a plan of reorganization if an objecting class of unsecured creditors is not paid in full. *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988) (farmer in Chapter 11 attempted to retain his farm over the objection of the unsecured creditors); *In re Stegall*, 865 F.2d 140 (7th Cir.1989) (the same); *In re Yasparro*, 100 B.R. 91 (Bankr.M.D.Fla. 1989) (individual debtor attempted to retain assets over objection of the unsecured creditors). This means that if Bay State controls a class and objects to Debtor's Plan, then under a correct application of the absolute priority rule Debtor could not retain his Country Maid stock. In order to cram down a plan over Bay State's objection, the plan would have to provide for the liquidation of Debtor's Country Maid stock. However, the Court cannot presently say that Debtor is unwilling or unable to do so. Should he seek to do so, that must of course be done either through a Plan or through other procedures to be approved by the Court on notice and motion.

35. Bay State also argues that Debtor's case should be converted on account of Debtor's lack of "objective" good faith because he is only a shareholder of Country Maid and is not "operating a business." Essentially Bay State's argument

is that a debtor who is not operating a business is not entitled to the legal remedy of a Chapter 11 reorganization. Bay State relies on *In re Klein,* 100 B.R. 1004 (N.D. Ill.1989) in support of its position.

36. In *Klein* the court ordered an individual debtor's case converted from Chapter 11 to Chapter 7 because Wayne J. Klein, the debtor, was not a "business debtor" and there was no ongoing business to reorganize. Klein was unemployed and the corporations which he owned and had previously operated were defunct. The court explained:

> [M]ere ownership of assets and investments (let alone inchoate ones) does not constitute an ongoing business. There must be evidence of means to sustain a plan of reorganization—things such as income, employees or a viable business. Klein shows none of these.

Id. at 1007. *But see In re Moog,* 774 F.2d 1073 (11th Cir.1985) (consumer debtor with no regular income eligible for Chapter 11 in certain circumstances); *In re Cook,* 98 B.R. 624 (Bankr.D.Mass.1989) (Chapter 11 not limited to business debtors, particularly given Code endorsement of liquidating plans). The court concluded that there was "no evidence whatever that Klein himself—as distinct from the now moribund Klein-owned corporations—was engaged in *any* sort of activity that could be the basis of a plan of reorganization." Id. at 1008.

37. The facts in *Klein* are distinguishable from the present case. Here Debtor is the president of Country Maid, an operating, ongoing family owned entity. Country Maid is a potential source of the income necessary for Debtor to reorganize his financial affairs. If Debtor's Plan eventually satisfies the best interests of creditors tests and the other standards for confirmation then Debtor will be able to retain his ownership interest in the business he supervises and his creditors will not be any worse off. Further, although Country Maid is not reorganizing and Debtor only owns a minority interest, Debtor's involvement in the business and his role in the business' success and future prospects are significant. The court in *Klein* does not specifically define the term "business debtor." Although Debtor is not a "business

debtor" in the sense that he is doing business as an unincorporated sole proprietor, in all practical respects, as the top management of a family owned, closely held business, he is a business debtor. The other cases relied on by Bay State, *In re Winshall Settlor's Trust,* 758 F.2d 1136 (6th Cir.1985), and *Wamsganz v. Boatmen's Bank of DeSoto,* 804 F.2d 503 (8th Cir. 1986), are similarly distinguishable. Bay State's motion to convert on this ground is denied.

38. If "cause" were clearly found to exist under § 1112(b), this court could either dismiss the case, or convert it. Judge Shadur of our District Court has held that "[o]nce the burden [of showing cause] is met, the court is given a discretionary choice between conversion to Chapter 7 and dismissal—remaining in Chapter 11 is not an option." *Klein,* 100 B.R. at 1008. *But see* 5 King, *Collier on Bankruptcy* ¶ 1112.03[d] at 1112–16 (15th ed. 1989) ("Conversion or dismissal of a Chapter 11 case by reason of the existence of one or more of the grounds set forth in section 1112(b) is not mandatory."). In this case all parties present at the hearing preferred conversion of the case to Chapter 7 rather than dismissal. However, such "cause" has not been demonstrated and the instant motion must fail. Consequently, the Bay State motion will be denied on the present record.

39. However, on the pending motion of Bay State and Creditors Committee the Court will consider appointment of a Chapter 11 Trustee, or alternatively, can consider an Examiner or Trustee with limited powers over the Country Maid stock of Debtor, under 11 U.S.C. § 1104. Should such motion be granted, upon receipt of any report by such officer a new motion by Bay State to dismiss or convert will be entertained if one would then be appropriate.

40. Any Conclusions of Law that may be contained in the Findings of Fact will stand as additional Conclusions of Law.