In re Souleman and Nexhmije
MUSSA, Debtors.

Michael G. BERLAND, not individually,
but as Trustee, Plaintiff,

v.

Souleman MUSSA, Nexhmije Mussa,
and James Mussa, Defendants.

Bankruptcy No. 95 B 16320.
Adversary No. 96 A 00189.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Dec. 5, 1997.

Richard G. Larsen, Myler Ruddy & McTavish, Aurora, IL, for Plaintiff.

Louis E. Neuendorft, Sandwich, IL, for Defendants.

Michael G. Berland, trustee.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK B.SCHMETTERER, Bankruptcy Judge.

This Adversary proceeding relates to the Bankruptcy proceeding filed by Defendants Souleman Mussa ("Souleman") and his wife Nexhmije Mussa ("Nexhmije") under Chapter 7 of the Bankruptcy Code, Title 11 U.S.C. ("Code"). The Chapter 7 Trustee, Michael G. Berland, filed a four-count Complaint to avoid certain transfers of Debtors' property and to deny Debtors' discharge pursuant to 11 U.S.C. § 727.

Count I was brought against Souleman, Nexhmije, and their son James Mussa ("James") to avoid transfers of property from Debtors to James alleged to be fraudulent pursuant to Code § 544(b) and 740 ILCS 160/1 *et seq.*, and also to enjoin the three Defendants from further disposing of or transferring their property. Count II was brought against Souleman and Nexhmije to deny their bankruptcy discharge because of an alleged fraudulent concealment of Debtors' property. Count III was brought against Souleman Mussa to deny his bankruptcy discharge pursuant to 11 U.S.C. § 727(a)(4) due to allegedly false testimony concerning property of the estate. Count IV was also brought against Souleman Mussa for denial of his discharge under 11 U.S.C. § 727(a)(5) for his alleged failure to satisfactorily explain a loss of assets.

On February 22, 1996, during pendency of this bankruptcy and adversary proceeding, Defendant Souleman Mussa died. On April 12, 1996, an order was entered herein dismissing him without prejudice from Counts II, III, and IV. That left pending only the Count I charges against Nexhmije and James, and the Count II charges against Nexhmije to bar her discharge, although the Trustee did not then seek dismissal of the other counts.

Following trial on Counts I and II and having considered the evidence and pleadings, the Court now makes and enters the

following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

(1) On August 9, 1995, Souleman and his wife Nexhmije Mussa (collectively "Debtors") filed their voluntary petition herein under Chapter 7 of the Bankruptcy Code, Title 11 U.S.C. *et seq.*

(2) Plaintiff Michael G. Berland is the duly appointed and acting Trustee in bankruptcy ("Trustee") for the estate of the Debtors. He filed this Adversary Complaint on February 13, 1996.

(3) Defendant James Mussa is the son of the Debtors and has at all times mentioned herein resided at 2558 North 4646th Road, Somonauk, LaSalle County, Illinois. Debtors had two other children, both of whom were minor children at all times mentioned herein.

(4) Souleman died on or about February 22, 1996. His death was caused by a brain tumor. On March 26, 1996, counsel of record for Debtors filed a Suggestion of his Death. No motion for substitution of parties was ever made, and no substitution of parties was ever made for him herein following his death.

(5) Nexhmije testified at trial that she can neither read nor write in English. She testified that she has the equivalent of a fourth grade education from Albania where she was born. She also testified that she had no knowledge of details concerning any transfers of property or any other family financial matters prior to her husband's death, and that when her husband instructed her to sign documents, she signed them without question.

(6) On April 10, 1994, Souleman was admitted to Mercy Center Hospital ("Mercy Center") for medical treatment due to a heart attack. On April 21, 1994, he was discharged from Mercy Center. At the time of his discharge, there was an outstanding balance due and owing from Souleman and Nexhmije to Mercy Center in the amount of $54,826.45 by reason of his treatment up to being discharged.

(7) Nexhmije testified that Souleman resumed some daily activities subsequent to his release from Mercy Center, but did not then perform physically as well as he did prior to his hospitalization. James testified that, prior to that hospitalization, Souleman worked seven days per week for 12 to 13 hours per day. However, after his release, he worked but a few hours each day for awhile, then less.

(8) In addition to their debt due to Mercy Center, Souleman and Nexhmije also owed six other health-care providers the total sum of $29,140.95 as evidenced by their bankruptcy schedules filed August 9, 1995. On November 11, 1995, Mercy Center filed an unsecured claim herein in the amount of $56,764.55. No other creditors filed proofs of claim in this bankruptcy case, not surprisingly since the case was filed scheduling no significant assets.[1]

(9) On April 11, 1994 (the day after her husband was admitted to Mercy Center), Nexhmije had filled out an application for public aid medical assistance. On her public aid application, she listed as assets only a checking account at Union Bank, Sandwich, Illinois with a stated value of $500. She failed to disclose any additional savings or other accounts in that application. However, testimony and evidence at trial established without doubt that at the time Nexhmije completed her application for public and medical assistance, the Debtors jointly owned a savings account at Union Bank with a balance at the time of $95,125.49. *See* Finding ¶ 17 for details. The public aid application was subsequently denied for failure to provide sufficient information to determine eligibility.

(10) Betty Jean Phillips ("Phillips"), a "large balance collector" in the patient accounts department of Mercy Center, testified

---

1. On August 19, 1995, a Notice of Insufficient Assets was sent to all creditors as reflected on and in the bankruptcy court docket for the Mussa bankruptcy case. Pursuant to that notice, creditors were told not to file a claim unless they receive specific notice from the clerk to do so.

No claims bar date has yet been set. Under Fed. R. Bankr.P. 3002(c), where a "no-asset" notice is sent to creditors and assets are subsequently obtained, a notice of assets is then to be sent to creditors who will then be given 90 days to file proofs of claim.

that she was responsible for the Souleman and Nexhmije account. On or about June 24, 1994 (two months after Souleman was discharged), Phillips sent the Mussas a letter from the hospital collection department notifying them that payment was required within thirty days of the April 21 discharge of Souleman from the hospital. Payment had therefore been due May 21, 1994. The letter also enclosed a financial statement for Souleman to complete and return so that Mercy Center and Souleman could develop a reasonable payment plan.

(11) Phillips testified that she spoke with Nexhmije and informed her that if the financial statement was not completed and returned, the matter would be turned over to Mercy Center's attorneys for suit. Around July 19, 1994, Phillips received a completed financial statement signed by Souleman. However, that financial statement disclosed only a savings account at Union Bank with a balance of $ 1,500. It did not disclose any other accounts at Union Bank or any of the cashier's checks which Debtors had obtained, having earlier purchased those checks out of their Union Bank account. *See* Findings ¶¶ 17–23 for details.

(12) Phillips and Nexhmije spoke again around the end of July 1994. At that time the Mussa account had already been sent to Mercy Center's attorneys for collection. Nexhmije telephoned Phillips to find out why the file had been sent to attorneys.

(13) Phillips testified that on or about June 24, 1994, she spoke with Nexhmije about a possible payment plan. During the July 1994 phone call, Nexhmije offered to pay $750 per month on the account, but Phillips said that Mercy Center refused to agree to monthly payments of less than $1500. Nexhmije told Phillips that she and her husband were unable to pay the balance in full because they had no assets or funds with which to do so, and no agreement was ever reached as to the amount of monthly payments to be made on the account.

(14) Attorney Jonathon Shanower whose law firm represents Mercy Center, was personally involved with collection matters. Shanower testified that his efforts to collect the Debtors' account began in August of 1994.

(15) On August 9, 1994, Mercy Center filed suit against both Debtors in the Circuit Court of Kane County, Illinois. A judgment was entered in favor of Mercy Center and against Debtors on February 2, 1995, in the amount of $54,109.67.

(16) A citation proceeding was begun by Mercy Center in the state court in February 1995. As part of that proceeding, in March of 1995, its attorney Shanower learned of certain transfers of Debtors' property described hereinbelow.

### Cashier's Checks Out of Union Bank Savings Account

(17) Prior to Souleman's discharge from the hospital on April 21, 1994, Souleman and Nexhmije Mussa jointly owned a savings account at the Union Bank of Sandwich, Illinois, under account number 43056–371–0. As of April 21, 1994 (the date Souleman was discharged from the hospital), there was about $95,125.49 in that account, and on April 25, 1994 (four days after Souleman left the hospital and two weeks after she falsified her public aid application by omitting this account), Nexhmije withdrew the entire balance from that account and closed the account.

(18) Nexhmije testified that Souleman was unable to travel to the bank at that time because of his health. A total of $90,000 from that account was placed by her into three cashier's checks, each in the amount of $30,000. The cashier's checks, numbers 54570, 54571 and 54569, were all payable to Nexhmije. From time to time as described below, she endorsed each of those checks in blank, and she testified that she then gave all of them to Souleman. She claimed in her testimony that she has no knowledge as to what happened to those checks after she signed each of them.

(19) On July 6, 1994, cashier's check number 54570 was deposited in the Farmer's State Bank into savings account number 13626, opened and held jointly by and in the names of James Mussa and Bardhyl Shehu ("Shehu"), a nephew of Souleman. Neither

James nor Shehu gave any consideration to Nexhmije or Souleman for the transfer of that $30,000 cashier's check.

(20) James testified that savings account number 13626 was established for the purpose of providing Shehu with "proof" of his ability to support a family so that his family would have the ability under United States immigration laws to live in the United States. James also testified that after Souleman's death he spent the proceeds of that account, most of it on his father's burial. However, at trial he supplied no receipts, canceled checks, or other evidence corroborating that he spent anything, let alone the $30,000 and interest thereon for payment of his father's funeral expenses or any other expenditure. Shehu did not testify.

(21) Both James and Nexhmije testified that the $30,000 in account number 13626 was always within the control of Souleman because, if Souleman had asked for its return, James and Shehu would have returned the money. However, there was no documentation corroborating that contention, and Souleman was not named on that account in any capacity. Counsel for Defendants argues that this account remained property of Souleman until his death. However, Souleman died after he filed in bankruptcy, and the account was not listed on Debtors' bankruptcy petition as property of either Debtor. The evidence established quite clearly, and it is hereby found that on July 6, 1994, Souleman and Nexhmije transferred all ownership of the $30,000 through cashier's check number 54570 to their son James pre-bankruptcy for no consideration in order to avoid the claims of Mercy Center.

(22) The reverse side of the remaining two cashier's checks purchased from Union Bank account proceeds indicate that cashier's check number 54571 was negotiated by Nexhmije on or about July 15, 1994 (during the period that Phillips was pressing the Mussas for payment), and cashier's check number 54569 was negotiated by her on June 7, 1995 (two months before the August 9 bankruptcy filing). Nexhmije endorsed both

checks in blank. Debtors' bankruptcy schedules neither list these cashier's checks nor any proceeds thereof as assets of the estate. Neither Nexhmije nor James have given any explanation as to the disposition of cashier's checks 54571 and 54569 or the proceeds from these checks, even though the latter check was cashed shortly before the bankruptcy filing.

(23) On August 7, 1995, under penalty of perjury and as part of their bankruptcy petition, Debtors' each signed a statement of financial affairs for a debtor not engaged in business. On their forms, Souleman and Nexhmije each stated that they had no safe deposit boxes. However, on June 9, 1995 (two days after the third and last $30,000 check was negotiated), Nexhmije had opened a safe deposit box in her name at Farmer's State Bank. This occurred eight months before her husband died, at a time that she testifies she deferred to her husband's management of their affairs and that she had to nothing to do with management of those affairs. This is the same bank where all three cashier's checks were processed and where James opened his account jointly with Shehu upon deposit of the first $30,000 cashier's check negotiated by Nexhmije. The foregoing circumstances in light of all the evidence demonstrated that Nexhmije disposed of proceeds from the two $30,000 checks numbered 54571 and 54569 to hide those proceeds from the claims of Mercy Center and her other creditors.

### Real Estate

(24) On or about April 10, 1994 (when Souleman entered Mercy Center for treatment), and prior to that date, Souleman and Nexhmije were owners in joint tenancy of certain Illinois real property located in LaSalle County and Bureau County. There were no mortgage liens encumbering those properties as of July 29, 1994. As of the latter date, pursuant to the records of the LaSalle and Bureau county tax assessors, those properties had the following values:

| 2459 | Crest Field Drive, Northville Township, LaSalle County, Illinois | $222,084.00 |
|------|-------------------------------------------------------------------|-------------|
| 823 | North Beech Street, Princeton, Bureau County, Illinois | $ 78,180.00 |
| 1009 | North Beech Street, Princeton, Bureau County, Illinois | $ 87,390.00 |
| **TOTAL** | | **$387,654.00** |

(25) On June 3, 1997, for purposes of trial, the parties herein stipulated that the amounts listed as values of those three properties by the county real estate tax assessors, as shown in Finding No. 24, were the fair market values for those respective properties.

(26) On July 29, 1994 (a few days after a Mercy Center lawyer first contacted them), Souleman and Nexhmije made, executed, and delivered certain Warranty Deeds transferring these three parcels of real estate to their son James. The deeds were then recorded in the Office of Recorder of Deeds of LaSalle and Bureau Counties, Illinois. The face of the deeds indicate that the transfers were exempt from Illinois state transfer tax because consideration for each deed was less than $100.

(27) James testified that neither Souleman or Nexhmije owed him any sum of money at the time of the transfer. He also admitted that he paid no cash as consideration for any of the three properties. He contends that consideration or value received by Debtors from James in exchange for the conveyances of the real property consisted of his "promise" to pay the taxes, insurance and maintenance on the property and to support his parents and their minor children in the future.

(28) James testified that subsequent to the real estate transfers, he paid his mother $1,500 each month to help support her and her two minor children. There was no written agreement concerning these payments. No canceled checks or receipts were offered to demonstrate that these payments were actually made. Moreover, there was no agreement or other document offered to corroborate James's testimony about his alleged "promise."

(29) The properties located at 1009 and 823 Beech Street were used by the Mussas as rental properties. Prior to the title transfers, Souleman collected the rents on these properties. After the conveyances, James collected the rents, and used part of those rents to pay property taxes, insurance, and maintenance for the rental properties. The rental amount paid for 823 Beech Street was $500 per month ($6,000 per annum) which was more than sufficient to pay the annual real estate taxes of $2,298.92 per annum. The rental amount paid for 1009 Beech Street was $500 per month ($6,000 per annum) which again was more than sufficient to pay the annual real estate taxes of $2,211.32 per annum for that property. Defendants offered no documents to demonstrate costs of insurance or maintenance on those properties.

(30) The house at 2459 Crest Field Drive was the family home. James testified that at one time he had resided in the family home, but he moved out permanently in 1992 or 1993. After the transfer of title to James, Souleman and Nexhmije continued to reside at that property located and enjoyed all benefits associated with that property. Following the title change in their home, Debtors paid no rent to James while continuing to reside at that property. James has not resided at that residence since the title transfer.

### The Restaurant

(31) Prior to October 11, 1994, Souleman was the sole owner and shareholder of Mussa Restaurants, Inc., an Illinois Corporation, which operated a restaurant business located at 740 E. Market Street, Somonauk, Illinois.

(32) On October 11, 1994 (two months after the Mercy Center suit was filed), Souleman transferred all of stock and assets of that corporation to his son James. The assets transferred included all of the inventory, fixtures, furnishings, supplies, and other personal property of the restaurant business as well as the land and building where the restaurant was located.

(33) James testified that he paid no cash for transfer of the restaurant corporate stock. He claims that he agreed to assume a $50,000 mortgage on restaurant real estate and certain corporate debts such as contracts and leases. However, when questioned, James failed to give details as to the nature or value of the other alleged corporate debts. Moreover, the document transferring restaurant property stated that "no consideration [was] to be charged said James S.H. Mussa for conveyance of the real and personal property of the estate for reason of his said past contributions to payment of corporate debts." Ex. 5. James did not corroborate by documents his asserted agreement to assume the mortgage and corporate debt, nor did he establish through documents his supposed "past contributions to payment of corporate debts." However, he appears to have made payments on the mortgage and more than likely did assume it.

(34) In May of 1996, three months after the filing of this adversary proceeding, James sold and conveyed all stock and assets of Mussa Restaurant, Inc. to a third party for the sum of $160,000. James presently receives the sum of $2,000 per month under that sale contract resulting in a payment stream totaling $240,000 that is provided for payment over a ten-year period. James opined at trial that, although this was a proper price for the restaurant in May of 1996, it did not reflect the value of the corporate stock and assets when transferred from the Debtor Souleman to James in October of 1994.

(35) No expert testimony was offered by either side as to value of the restaurant and property connected to it. James testified that in 1994, the restaurant and restaurant property were worth, in his opinion, only between $70,000 and $80,000. He offered no support for this estimate and the defense offered no additional evidence as to value of the stock and restaurant property. James did testify that between the time of transfer from Souleman in 1994 and the sale to the third party in 1996, new road construction put the restaurant at a busy crossroads thus increasing its value. James also testified that business increased significantly as a result of this construction, although the amount of such asserted increase was not documented by restaurant records or otherwise.

(36) James also testified that he put nearly $29,000 into the restaurant after receiving it from his father, claiming that this money was spent on repairs and purchase of a new grill, fryer, chairs, and tables. He testified that this money came from his safety deposit box and was money that he had saved throughout the years (denying that it came from the $90,000 in three cashier's checks discussed earlier). He did not corroborate this testimony with documents showing his savings history or with records of the $29,000 in asserted expenditures.

(37) The value for the restaurant and the real property upon which it sat had a value of between $80,000 (the value estimated by James) and at least $131,000 (the sale price of $160,000 in 1996 less $29,000 assertedly invested by James after the title transfer from his father) in October of 1994. No expert appraiser testified to the asserted increase in value between 1994 and 1996 due to improved traffic past the restaurant, nor was evidence offered to corroborate James's opinion of value in 1994. The evidence, such as it is and taken all in all, supports a value of the restaurant and business of at least $105,500 when it was transferred in 1994 (taking the average of $131,000 and $80,000).[2]

---

2. Defendant's counsel argues that "the testimony of actual intent is binding upon the Plaintiff in this proceeding." Defendant's Proposed Findings and Conclusions at 17. However, it is up to the Court as trier of fact to weigh evidence and evaluate the credibility of the witnesses. Testimony, even uncontroverted testimony, is not *per se* required to be taken at face value. James stated his opinion as to the value of the restaurant. However, Defendants offered no foundation at trial as to the source of this knowledge or what special knowledge or training James had

which would allow him to testify as to the value of the restaurant. While the trier of fact cannot ignore uncontradicted testimony unless it is inherently unbelievable, where testimony is contradicted by other testimony or circumstances, the court "decides the credibility and weight afforded such testimony." *People ex rel. Hartigan v. Anderson*, 232 Ill.App.3d 273, 276, 173 Ill.Dec. 852, 854, 597 N.E.2d 826, 828 (1992) (citations omitted). The actual value of $160,000 upon resale in 1996 to a third party in an arm's length transaction does contradict James's opinion of

(38) Both James and Nexhmije testified that one reason for transfer of the restaurant property was an Albanian tradition under which all property of the father goes to the son who must then care for the family. James also testified that the transfers occurred because Souleman, worried about his health, wanted to make arrangements for disposition of his property. James and Nexhmije each testified that Souleman was physically and mentally unable to manage or operate his restaurant business at the time, and that his intent for transfers of that business and other assets was his desire to make plans and arrangements for the support of his wife and children.

(39) Factual matters set forth in the Conclusions of Law will stand as additional Findings of Fact. Legal conclusions stated in the Findings of Fact will stand as additional Conclusions of Law.

## CONCLUSIONS OF LAW

### Jurisdiction and Venue

Subject matter jurisdiction lies under 28 U.S.C. § 1334. This case is before the Bankruptcy Court pursuant to 28 U.S.C. § 157 and Local General Rule 2.33(A) of the United States District Court for the Northern District of Illinois. Venue lies properly under 28 U.S.C. § 1409. This proceeding is a core proceeding under 28 U.S.C. §§ 157(b)(2)(H) and (J).

Count I of this adversary proceeding is brought pursuant to 11 U.S.C. § 544(b) and seeks to avoid the transfer of the Debtors' interest in property in violation of 740 ILCS 160/1 et seq. pursuant to 11 U.S.C. § 544(b). Counts II, III, and IV seek a denial of Defendants' discharge pursuant to 11 U.S.C. § 727(a)(2), (4), and (5). Counts III and IV of the Complaint were directed solely to obtaining denial of the discharge of Souleman, who was dismissed after his death. Pursuant to Fed.R.Civ.P. 25 (made applicable herein pursuant to Fed. R. Bankr.P. 7025):

If a party dies and the claim is not thereby extinguished, the court may order substitution of the proper parties ... Unless

the motion for substitution is made not later than 90 days after the death is suggested upon the record by service of a statement of fact of the death as provided herein for the service of the motion, the action shall be dismissed as to the deceased party.

As stated, on March 26, 1996, counsel of record for Debtors filed a Suggestion of Death for Souleman. No motion for substitution of parties was ever made, and no substitution of parties was ever made. Souleman was therefore dismissed from Counts II, III, and IV pursuant to an order entered April 12, 1996. Counts III and IV deal with false statements made by Souleman concerning Debtors' assets and assets of the estate. As those two Counts complain specifically about acts done by Souleman, and no representation has been established, they must be dismissed under Rule 7025.

### Count I

Code Section 544(b) provides:

The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

### Fraud in Fact

 The "applicable law" pertinent to Mercy Center's unsecured claim is the Uniform Fraudulent Transfer Act as adopted in Illinois, 740 ILCS 160/1 et seq. ("UFTA"). The purpose of UFTA is "to invalidate otherwise sanctioned transactions made with a fraudulent intent." In re Marriage of Del Giudice, 287 Ill.App.3d 215, 218, 222 Ill.Dec. 640, 642, 678 N.E.2d 47, 49 (1997) (citations omitted). The UFTA provides:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made

---

only $80,000 in value of the property only two years earlier, even taking into account his testi-

mony of improvements by him and improved traffic flow nearby.

the transfer or incurred the obligation with actual intent to hinder, delay, or defraud any creditor of the debtor....

740 ILCS 160/5(a)(1) (1993). Thus the Chapter 7 Trustee as plaintiff must show that Debtors transferred their property with the actual intent to hinder, delay or defraud their creditors. This is often called "fraud in fact." In determining whether a transfer is made with actual intent to defraud, UFTA sets out various factors or "badges of fraud" which may be considered, including whether:

(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was disclosed or concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all of the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred,

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

740 ILCS 160/5(b); *see also Kennedy v. Four Boys Labor Service, Inc.,* 279 Ill.App.3d 361, 369, 216 Ill.Dec. 160, 165, 664 N.E.2d 1088, 1093 (1996). The Trustee can prove actual intent based on the foregoing badges of fraud. *Steel Co. v. Morgan Marshall Industries, Inc.,* 278 Ill.App.3d 241, 251, 214 Ill. Dec. 1029, 1035, 662 N.E.2d 595, 601 (1996) (citing *Lindholm v. Holtz,* 221 Ill.App.3d 330, 163 Ill.Dec. 706, 581 N.E.2d 860 (1991)).

When the badges of fraud are "present in sufficient number, it may give rise to an inference or presumption of fraud." *Steel Co. v. Morgan,* 278 Ill.App.3d at 251, 214 Ill.Dec. at 1036, 662 N.E.2d at 602 (citing *Kaibab Industries, Inc. v. Family Ready Homes, Inc.,* 80 Ill.App.3d 782, 786, 14 Ill. Dec. 334, 372 N.E.2d 139 (1978)). In this case, quite a few of those "badges" have been established.

First, all transfers by Debtors of their property were to an insider, initially to Mrs. Mussa, and then by her to their son James. Under the UFTA, an "insider" of an individual debtor includes relatives of the debtor. 740 ILCS § 160/2(g)(1)(A). A relative means "an individual related by consanguinity within the third degree as determined by the common law, a spouse, or an individual related to a spouse within the third degree as so determined, and includes an individual in an adoptive relationship within the third degree." 740 ILCS § 160/2(k). As son of Souleman and Nexhmije, James was clearly an "insider." While a transfer between family members is not proof *per se* of fraudulent intent, such relationship is weighty proof of such intent. *Reisch v. Bowie,* 367 Ill. 126, 132, 10 N.E.2d 663 (1937) ("In particular, if a voluntary conveyance from a parent to a child results in hindering or delaying creditors, it will be regarded as fraudulent in law, irrespective of the honesty of the grantor's motives."); *Bartel v. Zimmerman,* 293 Ill. 154, 163, 127 N.E. 373, 376 (1920).

Second, Debtors remained in possession and control of the property located at 2459 Crest Field Drive subsequent to transfer of its title to James. It was uncontroverted that Souleman, Nexhmije, and their two minor children continued to live in the family home after the home was transferred to James. James did not live in the home for one to two years prior to the transfer, nor did James live in the family home after the home was transferred to him.

Third, the Mussas were aware that their account with Mercy Center was past due in late June, 1994. By the end of July 1994, they were aware that their account had been

sent to an attorney for collection from them. On August 9, 1994, Mercy Center filed its lawsuit against the Mussas. Thus, the Mussas were aware of suit threat by late July 1994 and of the pending lawsuit after August 9. Their savings account was withdrawn and placed into the three $30,000 checks prior to any threat of suit, but that was done after the debt to Mercy Center was incurred and four days after Souleman was discharged from that hospital. Transfers of the three parcels of non-restaurant real property were carried out after suit threat had been made, and the transfer of the restaurant business and its property was made while the Mercy Center suit was pending.

] Fourth, the transfers consisted of substantially all of Debtors' assets and left them insolvent. In this regard, it must initially be pointed out that the series of transfers by Debtors of their cash, property, and business to their son may be considered together for purposes of UFTA. Although the language of the UFTA speaks in terms of a single transfer of property, a series of transfers may also be found to be fraudulent. *See Falcon v. Thomas,* 258 Ill.App.3d 900, 196 Ill.Dec. 244, 629 N.E.2d 789 (1994); *Wieboldt Stores, Inc. v. Schottenstein,* 94 B.R. 488, 504 (N.D.Ill.1988) ("A general scheme or plan to strip the debtor of its assets without regard to the needs of its creditors can support a finding of actual intent.") (citing *In re F & C Services, Inc.,* 44 B.R. 863, 872 (Bankr. S.D.Fla.1984)). Where a debtor systematically reduces his estate leaving virtually nothing for creditors, the conveyances may be fraudulent. *Dorocke v. Farrington,* 43 Ill.App.2d 394, 397, 193 N.E.2d 593, 594 (1963) (Debtor systematically transferred his assets over the course of several years). Counsel for Defendants contended at trial that the transfers must be viewed as individual transfers, and therefore none of them, viewed individually, stripped Debtors of all their assets nor rendered them insolvent. However, the weight of authority does not support that view, as the foregoing cited authorities made clear.

Prior to the transfers, Debtors had over $588,000 in assets (three parcels of real property stipulated to be worth a total of $387,-654, a balance over $95,000 in a savings account, and a restaurant business valued by the evidence at $105,500). When their bankruptcy petition was filed, Debtors alleged therein that they had only $3,900 in assets (a bank account with a balance of $1,300, household goods valued at $1,500, wearing apparel and jewelry valued at $500, and an automobile valued at $600). Thus, prior to filing in bankruptcy, through a series of deliberate acts, Debtors transferred substantially all of their assets to their son James.

Further, while Defendants argued that Souleman was actually in control of the first $30,000 cashier's check and the account opened by James and Shehu despite the transfer of the check to James, the evidence at trial established that Souleman relinquished all control over the $30,000 when he and Mrs. Mussa transferred the cashier's check. *See* Finding ¶ 21. Debtors also relinquished control of the restaurant and the two rental properties.

Fifth, Debtors did conceal assets. They withdrew over $95,000 out of a savings account and placed $90,000 of it into three cashier's checks of $30,000 each, one of which was spent mysteriously out of the joint account of James and his cousin and two of which were negotiated by Nexhmije in blank and then cashed without any accounting for the proceeds. Over $5,000 in the original savings account was also withdrawn (evidently in cash to strip the account) but never accounted for.

Sixth, Debtors became insolvent at or shortly after the transfers were made. As stated, their bankruptcy petition listed only $3,900 in assets, and Debtors scheduled over $84,000 in debt. The UFTA defines insolvency as when "the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." 740 ILCS § 160/3(a). Debtors were clearly insolvent as a result of the transfers.

Seventh, the property transfers began shortly after Debtors incurred substantial debt. As of mid-April 1994, as a result of his hospitalization and poor health, Souleman incurred over $84,000 in debt to medical care providers. Almost immediately upon his release from the hospital, Debtors withdrew

over $95,000 from their joint savings account. One month later, Debtors transferred their home and rental properties to their son. Several months thereafter, Debtor transferred his restaurant business and all related assets to his son.

Thus, seven of the statutory factors or badges of fraud are present. The presence of so many of these factors gives rise to a presumption of fraudulent intent. *See Steel Co. v. Morgan,* 278 Ill.App.3d at 251, 214 Ill.Dec. at 1036, 662 N.E.2d at 602. The Trustee has thereby demonstrated fraud in fact with regard to Debtors transfers of their assets to their son.

Counsel for Defendants argues that this case is analogous to *In re Martin,* 113 B.R. 949 (Bankr.N.D.Ill.1990), in which the defendants there argued that transfers were made for estate planning purposes and not to defraud their creditors. Counsel argues that here as well as in *Martin* the plaintiff failed to introduce evidence as to assets retained as a result of the transfers. The bankruptcy judge's decision in *Martin* can hardly be viewed as strong authority since it was vacated on appeal. 124 B.R. 69 (N.D.Ill.1991). More to the point, the Trustee here did offer persuasive evidence as to the effect of each transfer on the remaining property. Prior to the transfers, Debtors had over $588,000 in assets. On July 6, 1994, after Mrs. Mussa transferred one $30,000 cashier's check to James, Debtors had over $558,000 in assets. On July 29, 1994, after the transfer of Debtors' three non-restaurant real properties, Debtors had only $165,000 in hard assets. On October 11, 1994, after the transfer of Mussa Restaurant business, Debtors had only $60,000 in cash assets. On August 9, 1995, after the two remaining $30,000 cashier's checks vanished, Debtors claimed on their schedules to have less than $4,000 in assets.

Counsel for Defendants makes a policy argument. He says that if transfers of this sort are not permitted ordinary property trade would be crippled, and "instead of there being an active interchange of property, the whole business of the country would stagnate." Defendants' Proposed Findings and Conclusions at 12. However, Debtors'

conduct was not ordinary trading or selling to third parties in arm's length transactions. Rather, they had a deliberate scheme that was fraudulent in fact, one designed to take all property out of Debtors' hands and into the hands of their son in order to avoid debts to their creditors. Indeed, they stripped themselves of assets over a short period in order to carry out that objective. If we are to believe the testimony of James and Nexhmije, the purpose was to carry out an Albanian tradition that the eldest son receive family property so as to care for his parents. How does such intent, if true, negate or change the quality of Debtors' intent? How is the transfer of property to another to use for care of the transferor instead of saving any to pay creditors different from transfers of property to avoid creditor claims? The former intent also carried out the latter purpose.

### *Fraud in Law*

Sufficient evidence was also established at trial to prove fraud in law. Section 6(a) of the UFTA as adopted in Illinois provides:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

740 ILCS 160/6(a) (1993). This is often referred to as "fraud in law." The elements of a cause of action under section 6(a) are "(1) the creditor's claim arose before the transfer, (2) the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transferred property, and (3) the debtor either was insolvent at the time of the transfer or became insolvent as a result of the transfer." *In re Schopp,* 1997 WL 459088, *5 (Bankr.N.D.Ill.1997) (citing *Falcon v. Thomas,* 258 Ill.App.3d at 909, 196 Ill.Dec. at 250, 629 N.E.2d at 795 (1994)); *Regan v. Ivanelli,* 246 Ill.App.3d 798, 804,

187 Ill.Dec. 351, 357, 617 N.E.2d 808, 814 (1993) (citing *Gendron v. Chicago and North Western Transp. Co.*, 139 Ill.2d 422, 438, 564 N.E.2d 1207, 151 Ill.Dec. 545 (1990)); *Kardynalski v. Fisher*, 135 Ill.App.3d 643, 647, 90 Ill.Dec. 410, 413, 482 N.E.2d 117, 120 (1985). No actual proof of fraudulent intent is required. *Id.* Once these three elements have been proven, a presumption of fraud arises. The burden then shifts to the transferor to show that adequate consideration was given or that the debtor retained sufficient property subsequent to the transfer to cover the creditor's claim. *Regan v. Ivanelli*, 246 Ill. App.3d at 804, 187 Ill.Dec. at 357, 617 N.E.2d at 814 (citing *First Sec. Bank of Glendale Heights v. Bawoll*, 120 Ill.App.3d 787, 792, 76 Ill.Dec. 54, 58–59, 458 N.E.2d 193, 197–98 (1983)).

] In this case, Mercy Center's claim arose before all the transfers. Souleman's debt to Mercy Center arose between April 10 and April 21, 1994. On April 25, 1994, Nexhmije converted $90,000 from the Mussa's savings account into three cashier's checks, and the balance of over $5,000 in that account disappeared. The cashier's checks were cashed between July 6, 1994, and June 7, 1995. On July 29, 1994, Souleman transferred $387,654 in total value of three real estate properties to his son James. On October 11, 1994, Souleman transferred his business and all its related assets worth $105,000 to his son. Thus, Mercy's claim arose prior to the transfers. Moreover, on June 24, 1994, Souleman received a letter from the collections department of the bank around June 24, 1994. During July 1994, Souleman's account was sent to a collection attorney. Thus, Mercy Center's claim arose prior to the transfers and Debtors were aware that they had a past due debt prior to Nexhmije's endorsing any of the cashier's checks and prior to any of the foregoing property transfers.

The next question is whether the Mussas made the transfers of property without receiving a reasonably equivalent value in exchange. Value, under the UFTA, is given for a transfer "if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person." 740 ILCS 160/4(a). "Whether the transfer is for 'reasonably equivalent value' [under the statute] in every case is largely a question of fact, as to which considerable latitude must be allowed to the trier of facts." *Leibowitz v. Parkway Bank and Trust Co.*, 210 B.R. 298, 301 (N.D.Ill.1997) (citations omitted). The Seventh Circuit has noted, in considering whether property was transferred for a reasonably equivalent value, that "the court must focus on what the debtor received in return for what he surrendered." *Leibowitz v. Parkway Bank and Trust Co.*, 210 B.R. 298, 301 (N.D.Ill.1997) (citing *Matter of Bundles*, 856 F.2d 815, 824 (7th Cir.1988)).[3]

As stated, after she stripped the savings account and converted the rest of it into three cashier's checks, Souleman first gave James a cashier's check for $30,000. James gave no consideration in exchange for that check and spent the proceeds subsequent to Souleman's death while this bankruptcy was pending. Moreover, James paid no cash as consideration for transfers of the three parcels of real estate. His testimony was that the only consideration exchanged was his promise to pay the taxes, insurance, and maintenance on the property and to support his parents and their minor children in the future. However, there was no evidence at trial as to the amounts of any insurance or maintenance that he actually paid. Moreover, the testimony at trial was that the rental value of the two investment properties far exceeded the taxes due on those properties. In addition, regardless of whether James actually made monthly support payments to his mother, value under the UFTA expressly excludes unperformed promises to furnish support to the debtor or another person. 740 ILCS 160/4(a). Finally, there was no document offered to corroborate the asserted promise.

---

3. "Since § 548 of the Bankruptcy Code and §§ 5 and 6(a) of the UFTA are analogous, the findings regarding § 548(a)(1) and § 548(a)(2) apply identically to the requirements of UFTA as adopted in Illinois." *In re Randy*, 189 B.R. 425, 443 (Bankr.N.D.Ill.1995) (citations omitted).

Reasonably equivalent value is measured at the time of the transfer. *In re Treasure Valley Opportunities, Inc.,* 166 B.R. 701, 704 (Bankr.D.Idaho 1994); *In re Gutierrez,* 160 B.R. 788, 790 (Bankr.W.D.Tex.1993) (citations omitted); *In re Robinson,* 80 B.R. 455, 460 (Bankr.N.D.Ill.1987); *In re Broumas,* 203 B.R. 385, 392 (D.Md.1996). At that time, James's promise to support his mother was an unperformed promise to furnish support and cannot constitute value. *See* Uniform Fraudulent Transfer Act § 3 commentary:

> "Value" is to be determined in light of the purpose of the Act to protect a debtor's estate from being depleted to the prejudice of the debtor's unsecured creditors. Consideration having no utility from a creditor's viewpoint does not satisfy the statutory definition. The definition does not specify all the kinds of consideration that do not constitute value for the purposes of this Act—e.g., love and affection.

*Id.* (citations omitted). Moreover, "a transfer for an unperformed promise by an individual to support a parent or other transferor has generally been held voidable as a fraud on creditors of the transferor." *Id.* (collecting cases).

Further, the very deeds transferring the real properties stated that the consideration for each transfer was less than $100. The fact that a deed states that a transfer is exempt from the real estate transfer tax because the actual consideration for the deed was less than $100 may be considered when determining whether reasonably equivalent value was paid for the transfer. *Falcon,* 258 Ill.App.3d at 910, 196 Ill.Dec. at 251, 629 N.E.2d at 796.

In exchange for the restaurant business and related properties, James says that he agreed to assume and pay a $50,000 mortgage and other debts. As James was unable to provide any specifics as to the nature or the value of the other alleged debts, and no writings were offered to corroborate his testimony, no value can be assigned to those other debts. Further the document transferring the restaurant property expressly stated that James was paying no consideration in exchange for the restaurant. Thus, even assuming the testimony of James was accurate

as to mortgage assumption, transfer of $105,-000 in value in return for assumption of a $50,000 debt is not a transfer for "a reasonably equivalent value."

Thus, while James received an estimated $523,154 in property ($387,654 for the real property, one $30,000 cashier's check, and an estimated $105,500 in value for the restaurant business) the only consideration he may have given was his assumption of a $50,000 mortgage and some vague promises to assume unproved corporate debts, plus his undertaking to pay real estate taxes, property insurance, and property maintenance on properties whose income far exceeded such obligations.

Where, as here, an alleged fraudulent transfer was to an immediate family member, the defendant has the burden to show reasonably equivalent value. *Falcon,* 258 Ill. App.3d at 910, 196 Ill.Dec. at 251, 629 N.E.2d at 796. Defendants did not meet this burden.

The final issue is whether Debtors were insolvent at the time of the transfers or became insolvent as a result of the transfers. As stated, insolvency occurs when "the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." 740 ILCS § 160/3(a). Also, as earlier stated, it is permissible to view a series of fraudulent transfers as one transaction for purposes of the UFTA.

Nexhmije withdrew over $95,000 from their savings deposit in April 1994. As of July 19, 1994, the Mussas had either cashier's checks or $90,000 in cash. As of August 9, 1995 (the date Debtors filed their bankruptcy petition), Debtors claimed that they had neither the checks nor the cash. Moreover, as a result of all their transfers, as of that date Debtors had $84,067.40 in debts and only $3,900 in assets. Even if Debtors or either of them were in possession of the two remaining cashier's checks after one was given to James, Debtors would still have been insolvent under the UFTA. Moreover, the entire set of circumstances give rise to the inference that the other two $30,000 checks were transferred out of Debtors' control when they were endorsed (since Debtors

denied possessing them). Thus, transfer to James of the first $30,000 cashier check, the properties located at 2459 Crest Field Drive, 823 North Beech Street, and the 1009 North Beech Street residence, and the stock of and real property owned by Mussa Restaurants, Inc. (but only to the extent of the $105,000 value over the $50,000 mortgage assumed) may be avoided by the Trustee, and appropriate judgment therefor will be entered. Since proceeds of the last two cashier's checks were not traced to James but actually hidden, judgment cannot lie to recover those sums from him.

### Count II

■ Count II of the Adversary Complaint as it stands following Souleman's death seeks denial of discharge of Nexhmije under § 727(a)(2):

> The court shall grant the debtor a discharge, unless ... the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
>
>> (A) property of the debtor, within one year before the date of the filing of the petition; or
>>
>> (B) property of the estate, after the date of the filing of the petition.

11 U.S.C. § 727(a)(2). Because the bankruptcy discharge provisions lie at the heart of the Bankruptcy Code's fresh start, *In re Graham*, 111 B.R. 801, 805 (Bankr.E.D.Ark. 1990) (citing H.R.Rep. No. 595, 95th Cong. 1st Sess. 384 (1977), U.S.C.C.A.N.1978, p. 5787), the provisions for objection to discharge under § 727 are to be construed in favor of the debtor. *Id.* (citations omitted). The Trustee has the burden to prove by a preponderance of the evidence that (1) a transfer or concealment of property of the debtor occurred; (2) the debtor transferred or hid the property with the intent to hinder, delay or defraud creditors; (3) the debtor made the transfer either within one year of the commencement of the bankruptcy case or after the date of the filing of the petition.

*Graham*, 111 B.R. at 805; *In re Gipe*, 157 B.R. 171, 176 (Bankr.M.D.Fla.1993).

■ There is no question that the transfers of Debtors proved here involved their property. The uncontroverted evidence at trial was that the monies in the savings account, the three parcels of real property, and the restaurant corporate stock and its related assets were originally owned either by Souleman or jointly by Souleman and Nexhmije.

Moreover, Debtors made their transfers with intent to hinder, delay, or defraud their creditors. "Before a debtor may be denied a discharge under section 727(a)(2), he must be found to have acted with the actual intent to defraud, hinder, or delay creditors." *Matter of Krehl*, 86 F.3d 737, 743 (7th Cir.), *reh'g denied*, (1996). "A showing of constructive intent is not sufficient." *Graham*, 111 B.R. at 805 (citing *Lovell v. Mixon*, 719 F.2d 1373, 1376–77 (8th Cir.1983)). "Because direct evidence of a debtor's intent usually will be unavailable, it may be inferred from the circumstances surrounding his objectionable conduct." *Krehl*, 86 F.3d at 743 (citations omitted). *See also Matter of Rivera de Montes*, 103 B.R. 362, 365 (Bankr.D.P.R. 1989) (noting that because debtors are unlikely to testify that their intent was fraudulent, court may view all facts and circumstances); *Graham*, 111 B.R. at 805; *In re Sawyer*, 130 B.R. 384, 395 (Bankr.E.D.N.Y. 1991) (because debtors who hide assets rarely announce it, court may look to badges of fraud to determine specific intent).

As stated, the testimony and evidence produced at trial demonstrated at least seven of the statutory badges of fraud. Debtors transferred most of their assets to an insider, their son, and had the rest (the two $30,000 cashier's checks in Nexhmije's name that she endorsed) were transferred and the proceeds hidden. Debtors enjoyed possession and control of one parcel of real estate (their home) subsequent to its transfer. Debtors were aware their account due Mercy Center was past due and had been sent to a collection attorney at or prior to transfer of the three parcels of real estate and were aware that a lawsuit had been filed against them prior to transfer of the restaurant property.

Those transfers consisted of substantially all of Debtors' assets. Debtors concealed at least the $60,000 from proceeds of two cashier's checks, and their son spent the $30,000 in cash transferred to him. Debtors became insolvent when the transfers stripped them of assets. Finally, the transfers began shortly after Debtors incurred substantial debt. From this history, Debtors' intent to defraud, hinder, or delay their creditors is clearly evident.

Moreover, the transfer of the restaurant business for less than its reasonable value occurred within one year of filing the bankruptcy petition. Also, the negotiation of the last $30,000 cashier's check and disappearance of its proceeds occurred June 7, 1995, only two months before bankruptcy was filed. However, it is undisputed that the transfer of one $30,000 cashier's check to James on July 6, 1994, the dissipation of a second $30,000 cashier's check following its negotiation by Nexhmije on July 15, 1994, and transfers of the three real properties occurred more than one year before Debtors filed their bankruptcy petition on August 5, 1995.

The Trustee argues, under the doctrine of continuing concealment, that Debtors may still be denied a discharge when circumstances indicate that the debtor continues to use the transferred property as his own. "The transfer of title with attendant circumstances indicating that the bankrupt continues to use the property as his own is sufficient to constitute a concealment." *Matter of Kauffman*, 675 F.2d 127, 128 (7th Cir.1981) (citing *Matter of Vecchione*, 407 F.Supp. 609 (E.D.N.Y.1976)).

"A legally relevant concealment can exist, however, only if there is, in fact, some secret interest in the property retained by the debtor." *Id.* (citations omitted). The retention of a secret interest in property is usually through oral agreement, through trust agreements, or otherwise. *In re Craig*, 195 B.R. 443, 449 (Bankr.D.N.D.1996) (Husband continued to live in home after transfer to wife but question was whether he could have had agreement to reconvey or was subject to eviction at wife's will); *In re O'Brien*, 190 B.R. 1 (Bankr.D.Mass.1995) ("Transfer of real property, held in names of Chapter 7

debtor and his non-debtor wife, to wife as trustee and beneficiary of realty trust for stated consideration of $1.00 was fraudulent"). "The courts which have addressed an alleged continuing concealment of real estate have identified the following factors as relevant: continued enjoyment of the property and continued payment of the real estate taxes and insurance ... [M]erely residing in the transferred residence without accompanying indicia of ownership did not constitute concealment." *In re McFarland*, 170 B.R. 613, 629–30 (Bankr.S.D.Ohio 1994) (citing *Patton v. Hooper (In re Hooper)*, 39 B.R. 324, 328 (Bankr.N.D.Ohio 1984); *Lucas v. Molden (In re Molden)*, 300 F.2d 5 (7th Cir.1962)).

Although Souleman and Nexhmije continued to reside in the family home subsequent to the transfer of that property, there was no agreement to return the property to Debtors after a discharge was granted. The property was solely in James's name, and James was and remains the owner. No continuing concealment of that property was shown.

Thus only two transfers of property were shown to have been made within the one year period prior to Debtors' bankruptcy petition. Within that period, Souleman transferred his restaurant to his son for less than a reasonable value, and Nexhmije dissipated or hid the final $30,000 cashier's check. Since the evidence did not show that Nexhmije participated personally in the restaurant sale, Count II turns on whether her concealing or unexplained expenditures of the last $30,000 is sufficient to bar her discharge.

It is true that denial of a discharge can be a harsh remedy. However, § 727 sets limits on the "rights of debtors to discharge." *In re Weldon*, 184 B.R. 710, 712 (Bankr.D.S.C. 1995). "While the law favors discharges in bankruptcy, it will not ordinarily tolerate the [debtor's] intentional departure from honest business practices where there is a reasonable likelihood of prejudice. Bankruptcy discharge is not a matter of right, but rather a statutory privilege afforded an honest debtor who meets certain requirements." *Id.* (citation omitted). Debtors' entire pattern of conduct should be considered. *In re Baker*, 205 B.R. 125, 134 (Bankr.N.D.Ill.1997).

Here, Nexhmije dissipated or hid the last $30,000 in cash assets on the eve of bankruptcy as the last step in efforts precisely intended to strip first her husband and then herself of virtually all assets so as to avoid creditors' claims. This scheme left Debtors without any material assets to pay their debts, unless Mrs. Mussa or James still possess some of the proceeds of cashier's checks that were not accounted for.

Denial of discharge in such circumstances is clearly required under the law. Judgment will therefore be entered in favor of Trustee on Count II of Trustee's Adversary Complaint to deny discharge under 11 U.S.C. § 727(a)(2).

### CONCLUSION

For reasons set forth above, by orders to be entered separately, judgments will be entered for Plaintiff on both Counts I and II of the Adversary Complaint. Injunctive relief is to be requested in an order in accord with Fed.R.Civ.P. 65(d), but bond is excused pursuant to Fed. R. Bankr.P. 7065. An order must also be entered dismissing Counts III and IV from which Souleman was earlier dismissed as a party, and dismissing Souleman from Count I, pursuant to Fed. R. Bankr.P. 7025.